Revised February 23, 2000

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-10916
_____


GARRY DEAN MILLER,

                                        Petitioner-Appellant,

                        versus

GARY L. JOHNSON, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

                                        Respondent-Appellee.

_____

Appeal from the United States District Court for the
                Northern District of Texas
_____
                    January 5, 2000

Before EMILIO M. GARZA, DeMOSS, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Petitioner Garry Dean Miller, convicted of capital murder in
Texas and sentenced to death, requests from this Court a
Certificate of Appealability (COA) pursuant to 28 U.S.C. §
2253(c)(2).  Miller raises several arguments on appeal, including
ineffective assistance of counsel, insufficient evidence to support
an affirmative answer to the second special issue, misleading
penalty phase jury instructions, and prosecutorial misconduct.
Finding that Miller has not made a substantial showing of the

denial of a constitutional right, we DENY the COA.

I.    BACKGROUND

Garry Dean Miller was indicted on November 30, 1988, on charges of the capital murder, murder, and aggravated sexual assault of April Marie Wilson (April), a child younger than fourteen years of age, on or about November 11, 1988.  Miller was tried before a jury on a plea of not guilty by reason of insanity.

The facts adduced during the guilt-innocence phase of the trial are set forth in the Texas Court of Criminal Appeals' opinion[1] on direct appeal and reflect the following:  In Miller's written confession, he stated that he arose early on the morning of November 10, 1988, and went to work.  At about 11:00 a.m., Miller went home and prepared lunch for his girlfriend, after which his girlfriend returned to school and he went to a friend's house.  Miller subsequently went home and apparently began drinking alcohol and continued to do so after arriving at his second job at the Merkel Country Club.  After completing his shift, Miller went to a bar and drank more and played pool.  He returned home about 1:30 a.m. on November 11, 1988, knowing that April, a seven-year-old child, was spending the night there.

Miller did not want to remain at home so he woke April to see if she wanted to go "riding around."  Eventually, Miller and April stopped riding around, and April hugged him because he "was

---

[1]  *Miller v. State,* No. 70,989 (Tex.Crim.App. May 12, 1993) (unpublished).

2

depressed." Miller "did not know what happened," but he started abusing April. He placed April on the tailgate of the truck; even though she was scared, he told her to remove her clothes. April was crying, and Miller told her to be quiet. He then removed his own clothes and raped her using hand lotion as a lubricant. Miller had to hold April down forcibly and did not stop even though she told him it hurt. After intercourse, Miller performed oral sex on April and forced her to perform oral sex on him by holding her head down. Miller again attempted to have intercourse with her. Miller panicked and started choking April and hitting her with something he had picked up from the ground.

April ceased fighting, and Miller, apparently believing she was dead, used coat hangers to drag her body into some brush. Miller went back to his home to retrieve April's belongings to dump with her body; however, he could not locate the body when he returned to the scene. Miller "passed out" after again returning home. Later that morning, the other individuals who lived with Miller noticed that April was missing. When Miller was asked if he had seen her, Miller stated that he had not; he then pretended to look for her. During Miller's subsequent confession, he expressed shame and sorrow that he had killed April.

The pathologist who performed the autopsy testified that the cause of death was "multiple blunt force injuries of the head, neck, and trunk." The fractures to the head were such that the blows had to be delivered with "extreme force," multiple times.

3

Many contusions and abrasions had been inflicted on April's face; her right jaw was fractured, which was consistent with being hit. There were bruises on and thorns in the ball of April's foot, indicating that April had put her foot down, possibly while being dragged. The pathologist described the appearance of trauma to both the vaginal and anal canals. In the pathologist's opinion, the excessive injuries to both the anal and vaginal cavities were caused by an object, other than a penis, in excess of five inches. Based on the above evidence, the jury found Miller guilty of capital murder.

During the punishment phase of the trial, the trial court readmitted all evidence admitted during the guilt-innocence phase. The following additional evidence was introduced during the punishment phase. The State introduced the testimony of Dr. Griffith, a psychiatrist, who taught medical school anatomy for several years before teaching psychiatry. He testified that the State's exhibit 87, which depicted April's genitalia, reflected that her anal opening was "totally destroyed," "almost mutilated." In Griffith's opinion, the five-inch tear in her colon could not have been caused by a penis and was caused by some other foreign object. In Griffith's opinion, Miller represented a continuing threat to society based upon the extremely brutal murder, a murder "as brutal as [Griffith] [had] ever seen in a child." Griffith observed that the murder was totally unprovoked and that Miller was meticulous during the killing and in his actions following the

4

killing.

During the cross-examination of Griffith, defense counsel introduced an article from a psychiatric journal that suggested that no significant difference existed in the accuracy of diagnostic predictions of future dangerousness of psychiatrists and those of laymen. Counsel introduced a portion of another article which recommended that the courts no longer ask experts to opine on future dangerousness because such opinions lacked reliability.

Dr. Karlson, a psychologist who testified at length on Miller's behalf during the guilt-innocence phase of the trial, testified during the punishment phase that he disagreed with Dr. Griffith's assessment that Miller was antisocial. Miller did not have the typical characteristics of a person with an antisocial personality, such as a long history of illegal acts prior to the age of eighteen, problems in school, truancy, cruelty to animals, petty theft, or a total lack of remorse. Karlson testified that Miller's behavior after the murder reflected the confusion of a troubled and very upset person who was not thinking clearly. In Karlson's opinion, Miller could not have consciously, intentionally, or deliberately planned a rape and murder because he was acting on "automatic pilot," during a dissociative episode.

Karlson acknowledged the possibility, however, that Miller would commit criminal acts of violence in the future that would constitute a continuing threat to society. He testified that if Miller were in the same circumstances again, a similar crime could

occur, but that the likelihood was extremely small because prior to the murder Miller was nonviolent. In Karlson's opinion, Miller had a tendency to try to please people and did not get angry or express anger in an appropriate way. In the days and months preceding the murder, Miller had been under a lot of pressure. Testimony indicated he was working three jobs, going to school, under financial pressure, had moved, and the week prior to the murder, had broken up with a serious girlfriend, someone with whom he was "very much in love." In Karlson's opinion, treatment would virtually guarantee no recurrence of the violent behavior. Although Karlson supported capital punishment for career criminals who lacked remorse, he was not in favor of the death penalty in this case because Miller, due to his mental disease or defect, was out of control for a short period of time. Karlson testified that the solution was confinement and treatment.

Miller also called numerous witnesses to offer testimony in mitigation of the death penalty. Ms. Townsend, Miller's former school teacher, testified Miller was a "fine outstanding young man." In Townsend's opinion, Miller did not commit the crimes deliberately and would not commit criminal acts of violence in the future. Miller never violated any of her classroom's rules. He was "an extremely good friend, a giver and not a taker," and was "just always such a friendly, nice kid, a nice guy always." She would have been proud to have him as her son.

Alice Carter, an employee at Camp Butman, worked with Miller

for five years and testified that she would ask the jury to consider that Miller's conduct was not deliberate. Miller needed help and a life sentence would be appropriate.

Shirley Ann Miller, Miller's stepmother, testified that Miller was not rebellious and was a very caring child who never got out of line and always "minded." He did not have violent reactions toward her and was not disrespectful. She testified that Miller could not have done something like this deliberately and that Miller would not commit criminal acts of violence in the future.

Randy Davis testified that Miller was his best friend and that Miller did not "con" or use him. Davis was aware that Miller drank and that he had been drinking that night. He testified that Miller could not have done this deliberately and that alcohol could have affected his behavior. Davis testified that if Miller got help, more likely than not, he would not commit violent acts in the future.

Don Russom, who used to work with Miller at a fire department, testified that he had never heard of Miller committing antisocial acts and that although he did not know whether Miller would be a continuing threat to society, he believed that a life sentence would be a more appropriate sentence than death.

Roy Smith, a friend of Miller's family, had known Miller since Miller was seven or eight years old. Smith testified that as a "robot," Miller may have committed the crimes but that he would not have acted deliberately and that he did not believe that Miller

would commit criminal acts of violence in the future.

Miller's mother, Patricia Edwards, testified that Miller was a good son, was never violent, and would not do "something like this again." Bill Miller, Miller's father, testified that Miller did not ever try to "con" people and that he always was more of a "giver" than a "taker." Bill Miller testified that he had "a bad drinking problem" when his son was young and that he had a violent temper when he was drinking. He would "slap [Miller's mother] around" while he was drinking. In his opinion, his son needed psychiatric treatment and would never repeat this behavior if such treatment was provided. He did not think that Miller did this deliberately.

Mickey Edwards, Miller's stepfather, testified that Miller was "absolutely trouble free" during the twelve years he had known him. Miller was obedient and well disciplined. He testified that under normal conditions, it would be impossible for Miller to have committed the crimes. He had never seen Miller mistreat an animal. Miller was "real kind and considerate to animals and people." Edwards did not think that Miller would commit criminal acts of violence in the future.

Following the punishment hearing, the jury answered affirmatively the special issues regarding the deliberateness of Miller's conduct and the probability of his future dangerousness,[2]

---

[2] Special issue number one asked "[w]as the conduct of [Miller], that caused the death of the deceased . . . committed deliberately and with the reasonable expectation that the death of

8

and the court sentenced Miller to death.

On May 12, 1993, the Texas Court of Criminal Appeals affirmed Miller's conviction and sentence in an unpublished opinion, and the Supreme Court denied Miller's petition for a writ of certiorari. Miller, through counsel, filed a state application for a writ of habeas corpus. The trial court issued findings of fact and conclusions of law, recommending that Miller's habeas application be denied. The "findings of fact" consisted of a brief recitation of the procedural history of the case and a statement that Miller's first amended state habeas application did not allege any new points of error concerning jurisdictional defects or denials of fundamental constitutional rights or set forth any new case law that in the court's opinion would change the opinion of the Texas Court of Criminal Appeals on direct appeal. The Texas Court of Criminal Appeals, after reviewing the record, determined that the findings and conclusions entered by the trial court were supported by the record and issued a written unpublished order denying the habeas application.

On May 21, 1998, Miller, through counsel, filed the instant federal petition for a writ of habeas corpus. The respondent answered and moved for summary judgment, stating that it believed that Miller had exhausted state remedies but declining to waive the

the deceased or another would result?" Special issue number two asked "[i]s there a probability that the defendant . . . would commit criminal acts of violence that would constitute a continuing threat to society?"

9

exhaustion requirement.[3] The district court heard oral argument on the summary judgment motion. At the hearing, defense counsel conceded that as to any one of the alleged instances of ineffective assistance, he probably had not demonstrated that the ineffective assistance was "material enough to change the outcome of the trial." Counsel argued, however, that the court should assess the representation as a whole.

Miller filed a response to the motion for summary judgment. The district court denied Miller's habeas petition, explaining its decision in a written order. Miller filed a motion for a COA, which the district court denied. Miller now requests a COA from this Court.

II. ANALYSIS

A. STANDARDS OF REVIEW

Miller filed his section 2254 application for habeas relief on May 21, 1998, which was after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA). His application is therefore subject to the AEDPA. *Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997). Under the AEDPA, a petitioner must obtain a COA. 28 U.S.C. § 2253(c)(2). A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a petitioner "must

---

[3] "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." § 2254(b)(2).

10

demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, 103 S.Ct. 3383, 3394 n.4 (1983) (citation and internal quotation marks omitted). Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination. *Fuller v. Johnson*, 114 F.3d 491, 495 (5th Cir. 1997).

The AEDPA prescribes the following standards of review:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was *adjudicated on the merits* in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d) (emphasis added).

Accordingly, section 2254(d) applies only to issues that have been adjudicated on the merits in state court.[4] In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's

---

[4] Review is *de novo* when there has been no clear adjudication on the merits. *Nobles v. Johnson,* 127 F.3d 409, 416 (5th Cir. 1997).

disposition of the case was substantive, as opposed to procedural. *Green v. Johnson,* 116 F.3d 1115, 1121 (5th Cir. 1997). We must determine whether Miller's claims were adjudicated on the merits by considering these factors: (1) what state courts have done in similar cases; (2) whether the case's history suggests that the state court recognized any ground for not resolving the case on the merits; and (3) whether the state courts' opinions suggest reliance on procedural grounds rather than an adjudication of the merits.

As for the claims that Miller now raises that were raised on his direct appeal, the Texas Court of Criminal Appeals did hold that one of the claims, prosecutorial misconduct, was procedurally barred. In regard to Miller's state habeas proceedings, the state did not raise a procedural bar in its answer to Miller's application for state habeas relief, and the trial court's denial of relief does not expressly mention the imposition of a procedural bar. After a review of the record, the Court of Criminal Appeals "denied" Miller's application for state habeas relief. Under Texas law a denial of relief by the Court of Criminal Appeals serves as a denial of relief on the merits of the claim. *Ex parte Torres,* 943 S.W.2d 469 (Tex.Crim.App. 1997). As such, except for the claim of prosecutorial misconduct, we are persuaded that the state courts did adjudicate Miller's claims on the merits.

This Court reviews pure questions of law and mixed questions of law and fact under § 2254(d)(1) and reviews questions of fact under § 2254(d)(2). *Drinkard v. Johnson*, 97 F.3d 751, 767-68 (5th

12

Cir. 1996). Under § 2254(d)(1), "an application of law to facts is *unreasonable* only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect." *Drinkard*, 97 F.3d at 769. Thus, this court "can grant habeas relief only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." *Id.* State court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. Section 2254(e)(1).

B.  INEFFECTIVE ASSISTANCE OF COUNSEL

Miller raises nine claims of ineffective assistance of counsel, stating that he is offering these examples as a "general cross-section of the record as a whole." The district court determined that all Miller's allegations of counsel's deficient performance were conclusory and that he had failed to make any specific demonstration of prejudice as a result of counsel's deficient performance. Miller fails to challenge the district court's conclusion on appeal. This Court has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding. *Ross v. Estelle,* 694 F.2d 1008, 1012 (5th Cir. 1983). "In the absence of a specific showing of how these alleged errors and omissions were constitutionally deficient, and how they prejudiced his right to a fair trial, we [can find] no merit to these [claims]."

13

*Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992).

In regard to three of the nine claims of ineffective assistance, the entire text of Miller's argument is simply that "[t]rial counsel failed to preserve error for appellate review." He then provides approximately twenty-nine cites to the record. Because Miller failed to set forth the nature of *any* of the errors trial counsel purportedly failed to preserve and did not assert any resulting prejudice, the district court properly determined that these three claims of ineffective assistance were conclusory.

As to the remaining six claims of ineffective assistance, the district court also addressed the merits of the claims, and, exercising an abundance of caution, we will do the same. To prevail on an ineffective assistance of counsel claim, Miller must show that his counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984). The complete argument set forth in regard to his fourth allegation of ineffective assistance is that his attorney "denigrated and withdrew Appellant's Motion to Transfer Venue." A review of the record indicates that Miller filed a motion for change of venue, arguing that he could not obtain a fair trial because of publicity prior to trial and local prejudice. The motion was supported by an affidavit signed by counsel's secretary and Miller's sister-in-law. Subsequently, counsel attempted to withdraw the motion but the trial court refused.

14

We agree with the district court's conclusion that Miller failed to demonstrate that his counsel's actions were unreasonable in light of counsel's apparent inability to find impartial witnesses to support the motion. Moreover, Miller has not shown that a re-urged motion would have been granted in the absence of any supporting evidence.

With no elaboration, Miller next claims that counsel "attempted to make an objection to the State's voir dire regarding probation or parole ramifications on sentencing and never does articulate an appropriate objection so that the trial court can rule." The record indicates that counsel filed a motion in the trial court, and the essence of counsel's argument was that the prosecutor should be prohibited from implying that if Miller received a life sentence, he would be eligible for parole within a short period of time. The trial court denied the motion, stating that it would not "restrict either party in the voir dire examination from [discussing] the full range of punishment." The court noted, however, that the issue of parole was *not* part of the court's ruling as to the motion. The court observed that the issue of parole was not properly raised in other cases and the court did not know why this case would be an exception.

As the district court recognized, counsel made a motion and obtained a ruling on that motion. Indeed, in response to counsel's motion, the court made clear that parole was not a proper issue for voir dire. Miller has not demonstrated that counsel's performance

15

was deficient or that he was prejudiced.

Miller next asserts that the prosecutor "interjected his belief that putting Appellant to death is proper. Trial counsel objected and his objection was sustained but [counsel] did not go further to perfect this point for appeal."

During the individual voir dire of juror Jay Baccus, the prosecutor stated the following:

> I believe the evidence will show that she was raped, vaginally and anally; do you see?
>
> . . . .
>
> And during the commission of this rape that she was murdered. I believe the evidence will show that she was choked but she didn't die, that she was bludgeoned with a blunt instrument until her head was crushed. I believe the evidence will show that, and I believe if selected as a juror that is what you will hear. I believe that if you believe that beyond a reasonable doubt that is what the evidence is, I believe that you too would believe that Garry Dean Miller needs to be killed; do you see?

Defense counsel objected, arguing that the prosecutor's statements assumed facts not in evidence and were an attempt to commit the juror to a course of action. The court sustained the objection. The court instructed Baccus that no one was "trying to tie you down to making a decision today. You can't do it because you don't have any evidence in front of you." The prosecutor then stated to the juror that he "certainly [was] not trying to commit you to anything."

After additional questioning, the prosecutor asked the juror

16

if he would be able to return an affirmative answer to the issue of Miller's future dangerousness based solely upon the instant crime. Defense counsel again objected, and the court ruled that the prosecutor had a right to delve into the special issues. Counsel obtained a running objection. The juror responded that he would be able to answer yes as to future dangerousness based solely upon the instant crime. The prosecutor then stated, "I believe you can. I believe you can and I believe under the evidence that you will if selected as a juror." Defense counsel again objected, and the court sustained the objection. Counsel asked the court to instruct the juror to disregard the prosecutor's last comment. In response to counsel's request, the court again instructed the juror that he should not be tied down to a specific course of conduct because he could not make a decision at that point.

The district court reasoned that if Miller's claim was that counsel should have objected on the ground that the prosecutor improperly was stating his personal opinion, the claim lacked merit because the prosecutor was stating that the evidence would support a death-sentence verdict, which was not improper under Texas law. The court reasoned that because any objection on this basis would have been overruled, Miller was not prejudiced. Citing *Miller v. State*,[5] the court further reasoned that even assuming the comments

---

[5] 741 S.W.2d 382, 391 (Tex.Crim.App. 1987) (noting general rule that there must usually be a timely, proper, and specific objection to the prosecutor's jury argument for a defendant to preserve the complaint for appellate review, but also noting exception that improper argument may present a Fourteenth Amendment

17

violated due process, trial counsel was not ineffective for failing to preserve error because prosecutorial misconduct that rises to the level of a due process violation does not require an objection to be preserved for appeal under Texas law.

The district court reasoned, alternatively, that if Miller's claim was that counsel should have preserved for appeal the objection that counsel did make, the claim still failed because reasonable counsel could have decided that the first comment by the prosecutor was not so prejudicial after the objection was sustained that a curative instruction was necessary. The district court also concluded that the prosecutor did not actually seek a commitment from the juror, but stated only that he believed that the evidence would convince the juror that Miller needed to be sentenced to death. The district court reasoned that the prosecutor's second statement that he believed that the juror would find future dangerousness under the evidence again did not seek to commit the juror. As to this second comment, defense counsel did request an instruction but the court refused to give an instruction. The district court properly found that Miller has shown neither deficient performance nor prejudice.

Miller argues that trial counsel was ineffective in failing to object to the introduction of the State's exhibit 95, Officer Drumheller's offense report. The State recalled Officer Drumheller

---

due process claim if the prosecutor's argument so infected the trial with unfairness as to make the resulting conviction a denial of due process)).

18

during the guilt-innocence of the trial, who testified as to the requirements of a business record for State's exhibit 95, a Texas Department of Public Safety data sheet, containing handwritten and typewritten information regarding Miller and the instant crime. Drumheller testified that he maintained the forms in the regular course of business of the Texas Department of Public Safety. After the State offered the exhibit, defense counsel stated that he had no objection, "subject to prior agreement." Drumheller then testified as to various statements Miller made to him regarding his physical and mental condition, which questions and answers, Drumheller testified, were accurately reflected in the exhibit. Defense counsel then cross-examined Drumheller.

The district court determined that defense counsel apparently had reached an agreement with the State not to oppose the admission of the document. Although the agreement was not reflected in the record, the court presumed that counsel's conduct fell within the range of reasonable assistance, "especially in the case of a conscious and informed decision of trial strategy." The court further noted that Miller made no attempt to demonstrate why the document was objectionable.

Miller does not explain on appeal on what ground counsel could have objected or argue that the result of the trial was rendered unreliable as a result of counsel's failure to object. Miller has shown neither deficient performance nor prejudice.

Miller also argues that his counsel failed to object to the

19

prosecutor's statement to the venire panel that a verdict of not guilty by reason of insanity allows the accused to "walk" away "totally free," despite the fact that the prosecutor's statements violated Tex. Code Crim. P. Ann. art. 46.03 § 1(e). During voir dire, the prosecutor stated that, "if you are insane at the time of the commission of the offense, sane at the time of trial you walk. You are through, a complete and total defense." Defense counsel did not object. Defense counsel did, however, state later during voir dire that:

> [The prosecutor] said temporary insanity. If you return a verdict of temporary insanity Gary Miller walks. That's not true. That is a totally incorrect statement of the law. He does not walk. He is subject to psychiatric incarceration, supervised by the statutes.

Thereafter, defense counsel commented on the issue of temporary insanity as follows:

> Let's go back to temporary insanity just a minute. This imposes three types of considerations on the jury: Number one, it imposes an issue on you individually on how you feel about temporary insanity. Because if it is brought up, then it must be considered by you. And the law will require you to consider it. It is a legal issue because it is presented as a legal defense. That does not mean that the defendant walks as [the prosecutor] said. He does not.

The prosecutor then objected to counsel's statements as purported misstatements of the law, and defense counsel responded that they could "read the statute right now." The prosecutor then said, "[r]ead the statute," and the court responded, "I will instruct the jury on what the law is with regard to the insanity defense. The

20

jury has already been instructed that the law will come from the Court."

Outside the presence of the venire panel, defense counsel and the prosecutor discussed the issue of the consequences of a verdict of not guilty by reason of insanity. Defense counsel asked the court to instruct the jury that the prosecutor misstated the law by implying that a verdict of not guilty by reason of insanity would result in Miller going "free as a bird." The court stated that it could instruct the jury that neither the prosecutor nor the defense may inform a juror or prospective juror of the consequences to the defendant of a verdict of not guilty by reason of insanity. The court also stated that it could instruct the jury that any comments made in voir dire by either attorney should be disregarded.

On direct appeal, the Texas Court of Criminal Appeals, although observing that neither attorney should have commented on the consequences of a verdict of not guilty by reason of insanity, held that Miller had not shown prejudice. The court presumed that defense counsel believed his remark to the venire was strategically the best method to address the State's improper comment and that defense counsel believed that this cured any harm.

Miller has failed to demonstrate that counsel acted unreasonably. Once the prosecutor made the comments, defense counsel could have reasonably believed that an objection, at best, would have resulted in an instruction to disregard, in light of article 46.03 § 1(e), Tex. Code Crim. P., which prohibits the

21

court, the prosecutor, or defense counsel from informing the jury of the consequences of an insanity verdict. As the district court concluded, it was not unreasonable for counsel to believe that responding to the prosecutor's remarks would be more effective in removing any possible taint from the jury than a simple instruction to disregard. Indeed, by not objecting, counsel used the opportunity to put before the jury favorable information that he would not have been allowed to had he made an objection. Defense counsel used the prosecutor's misstatement to inform the jury that, in the event Miller was found not guilty by reason of insanity, Miller would not be set "free." Such strategy was not unreasonable. Miller has not demonstrated that counsel's performance was constitutionally deficient.

Miller argues that his counsel was ineffective in failing to object when the prosecutor asked him on cross-examination if it was "time to get the needle." During the cross-examination of Miller, the following exchange took place:

> Prosecutor: Now, Garry, let's quit this --
> this is the first time you have ever pulled a
> deal like this, isn't it?

> Miller: No, sir, it's not the first time I
> have cried.

> Prosecutor: The first time anybody has ever
> seen you?

> Miller: You haven't been over at the jail,
> sir, watching me.

> Prosecutor: You are scared, aren't you?

> Miller: Yes, sir. I believe anybody would be

22

scared.

Prosecutor: It's time to get the needle, isn't it?

Miller: Sir, I am testifying because I have to say what I remember.  That's the reason I am testifying, sir.

Prosecutor: You are testifying trying to save your life, aren't you?

Miller: Sir, I don't know if I want to live or die, to be honest with you, sir.

Prosecutor: You want to tell this jury to put the needle in me, then?

Miller: I will leave that up to them to judge, sir.

Questioning then continued regarding Miller's written confession.  On direct appeal, the Texas Court of Criminal Appeals determined that although the State's remarks may have been improper, Miller failed to show how the remarks prejudiced his defense; the court refused to speculate as to prejudice.

Miller has not provided any argument as to why the questioning was objectionable or in what specific way his trial was rendered unreliable by the lack of an objection.  The district court reasoned that the questions were a proper method of impeaching the purported basis for Miller's emotional outburst by suggesting that Miller was crying because of the impending punishment, not because of his own remorse.  Under those circumstances, Miller has failed to show that counsel's performance was deficient or that he suffered any prejudice.

In conclusion, Miller has not made a substantial showing of

23

the denial of a federal right. Miller therefore is not entitled to a COA on these claims.[6]

C.   SUFFICIENCY OF EVIDENCE TO SUPPORT SPECIAL ISSUE TWO

Miller contends that the evidence was insufficient to support the jury's affirmative answer to the second special issue during the punishment phase, namely, whether there is a probability that Miller would commit acts of violence constituting a continuing threat to society beyond a reasonable doubt. He asserts that the evidence introduced to demonstrate his future dangerousness was confined largely to the brutal and vicious nature of the murder. If that is sufficient, he argues, then virtually any murder involving the aggravated sexual assault of a child would also support such a verdict.

This Court examines all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the issue in controversy to have been proven beyond a reasonable doubt. *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993). We apply this standard looking to the state's substantive law, giving great weight to the state court's determination. *Foy v. Donnelly*, 959 F.2d 1307, 1313-14 (5th Cir.

---

[6] Miller further argues that the "cumulative effect of numerous errors of counsel rendered counsel's performance inadequate." As set forth above, Miller has not demonstrated error by trial counsel; thus, by definition, Miller has not demonstrated that cumulative error of counsel deprived him of a fair trial. *See Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993) (explaining that because certain errors were not of constitutional dimension and others were meritless, petitioner "has presented nothing to cumulate").

24

1992).   Under Texas law, although a number of factors may be considered in making the determination as to future dangerousness, the facts of the crime alone, if severe enough, can be sufficient to support the affirmative finding to the special issue.  *Vuong v. State,* 830 S.W.2d 929, 935 (Tex.Crim.App. 1992).[7]

On Miller's direct appeal, the Texas Court of Criminal Appeals opined as follows:

> The evidence was sufficient to support the jury's affirmative finding to special issue number two for numerous reasons.  While some evidence does militate against this finding (appellant's clean criminal record), any such evidence is far outweighed by the aggravating evidence.  The facts of the murder

---

[7]   The following is a non-exclusive list of factors:

1.   The circumstances of the capital offense, including the defendant's state of mind and whether he was acting alone or with others;

2.   The calculated nature of the defendant's conduct;

3.   The deliberateness exhibited in the execution of the crime;

4.   The existence and severity of any previous offenses committed by the defendant;

5.   The defendant's age and personal circumstances at the time of the offense;

6.   Whether, at the time of the offense, the defendant was acting under duress or the dominion of another;

7.   Psychiatric evidence; and

8.   Character evidence.

*Vuong,* 830 S.W.2d at 934-35.

25

itself show that appellant was just shy of twenty-one years of age, whereas, the victim was only seven. While these facts do not indicate that the murder was premeditated, they do illustrate that appellant brutally raped the victim, vaginally and anally, before he very deliberately and repeatedly choked and beat her to death. Further, while still working alone, appellant attempted to conceal the murder and faked concern by appearing to help look for the girl when she was reported missing. Additionally, while allegedly mitigating evidence of appellant's good behavior in school, work, and prison was presented, evidence was also presented that appellant could be "violent and disruptive when`crossed.'" Finally, psychiatric evidence was presented by Dr. E. Clay Griffith that, based upon the brutal facts of the murder, the attempt at concealing the occurrence, and the subsequent lying to maintain the charade, there was every reason to believe that some sort of violence would occur again in the future. Viewed in its entirety the evidence was such that a rational trier of fact could have found beyond a reasonable doubt that appellant would probably commit criminal acts of violence that would constitute a continuing threat to society.

The evidence in this case is that Miller acted alone and that his conduct in committing the crime was very deliberate. The pathologist testified that the cause of death was multiple blunt force injuries of the head, neck, and trunk. The fractures to the head were such that the blows had to be delivered with extreme force and multiple times. Numerous contusions and abrasions had been inflicted on the seven-year old victim's face; her right jaw was fractured, and there were injuries on the ball of her foot, indicating that she had put her foot down, possibly while being dragged. She sustained excessive injuries to both the anal (a

26

five-inch tear in her colon) and vaginal cavities that, in the pathologist's opinion, were caused by an object, other than a penis, in excess of five inches.

Dr. Griffith, a psychiatrist called by the State, testified that it was his opinion that Miller represented a continuing threat to society based upon the extremely brutal murder, a murder "as brutal as [Griffith had] ever seen in a child." Griffith observed that the murder was totally unprovoked and that Miller was meticulous during the killing and as to his actions following the killing.

Also, the defense called a psychologist, Dr. Karlson, who testified that Miller had committed the crimes during a dissociative episode. Karlson disagreed with Griffith's conclusion that Miller had an antisocial personality. He did not believe that Miller consciously, intentionally, or deliberately planned a rape and murder because he was acting on "automatic pilot." Karlson did however acknowledge the possibility that Miller would commit criminal acts of violence in the future, but he thought there was little likelihood of future violence because prior to the murder Miller was nonviolent. Karlson believed that treatment would virtually guarantee that Miller would not continue to commit violent acts.

Although there was some evidence militating against a finding of future dangerousness, the evidence must be viewed in the light most favorable to the verdict. Here, the evidence of Miller's

27

deliberateness and brutality in the execution of this heinous crime, coupled with the psychiatric testimony, amply support an affirmative finding to the issue of future dangerousness. *See Vuong,* 830 S.W.2d at 935 (explaining that crime was of such a calculated and brutal nature that, even without expert psychiatric testimony and prior extraneous offenses, a rational jury could have found that the defendant was a continuing threat to society). Miller has failed to make a substantial showing of the denial of a federal right. Indeed, the state court's conclusion that the evidence was sufficient to support an affirmative finding regarding Miller's future dangerousness did not result in a decision that was contrary to, or involve an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).

D.    JURY INSTRUCTIONS REGARDING EFFECT OF A "NO" VOTE

At the punishment phase, the jurors were instructed that if all twelve jurors find that the State has proven a special issue beyond a reasonable doubt, the presiding juror will record the jury's answer of "yes." The charge instructed that if ten or more jurors vote "no," then the answer of the jury shall be "no" to that special issue.

Miller argues that because the jurors were not instructed that the consequences of a failure to reach either of the above two options was a life sentence,[8] the risk that one or more jurors

---

[8]    The Texas Code of Criminal Procedure expressly prohibited

28

would change a vote to satisfy the majority is too great to pass muster under the Eighth Amendment. More specifically, he contends that the charge mislead the jury regarding the effect of a "no" vote by a single juror as to either special issue.[9] He asserts that the jurors were instructed that they had only two options: either the jurors would unanimously agree to answer all of the special issues affirmatively, which would result in the imposition of a death sentence; or at least ten jurors would agree to answer one or more of the special issues negatively, which would result in the imposition of a life sentence.

Contrary to Miller's assertion, the jury at his trial was instructed what to do if they did not reach agreement as set forth in the charge. The jury instructions provided that if there was any special issue on which the vote of the jurors was not unanimously 'yes' or not at least ten in favor of an answer of 'no,' there should be no answer for that special issue and the presiding juror should not sign his or her name to any answer form

informing the jury of the effect of a failure to agree on the special issues. Tex. Code Crim. Proc. Ann. Art. 37.071 § 2(a).

[9] In support of this contention, Miller refers to two notes the jury sent to the court during deliberations. The first note inquired whether "[i]f the jury votes once on an issue without an acceptable conclusion of either 12 yes or 10 no, do we stay in deliberation until a conclusion is reached or do we turn the charge in unsigned?" In the second note, the jury asked the following questions, "[i]f we do not reach a decision[:] What happens? hung jury? retrial?" The judge gave the following response to both notes: "[y]ou are instructed that all of the law to which you are entitled is contained in the Court's Charge. Please refer to the Court's charge."

for that special issue.

Nevertheless, relying on *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860 (1988), Miller asserts a reasonable juror could have believed that their individual vote was not meaningful unless some threshold number of jurors were in agreement on that particular special issue. This claim will afford Miller no relief.

In *Mills,* the Supreme Court held that the Eighth Amendment was violated because the jury instructions may have precluded the jury from considering mitigating evidence unless all twelve jurors agreed that a particular circumstance was supported by the evidence. 486 U.S. at 384, 108 S.Ct. at 1870. Subsequent to *Mills,* the Supreme Court has explained that "*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy v. North Carolina,* 494 U.S. 433, 442-43, 110 S.Ct. 1227, 1233 (1990).

This Court has explained that *Mills* is not applicable to the capital sentencing scheme in Texas. We have concluded that "[u]nder the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance." *Jacobs v. Scott,* 31 F.3d 1319, 1329 (5th Cir. 1994). "*Mills* does not require a certain number of jurors to agree to impose the death penalty." *Id.* Miller's jury was instructed in conformity with Texas law. In light of our precedent, Miller has not made a substantial showing

30

of the denial of a constitutional right.  Moreover, our precedent precludes him from demonstrating that the state court's resolution of this claim involved an unreasonable application of clearly established federal law as determined by the Supreme Court.

E.   *PENRY* CLAIM

Miller argues that the jury charge did not allow the jury to express a proper moral reaction to the mitigating evidence.  He contends that the evidence that he was suffering from a severe mental illness, a dissociative episode, during the offense, should have been considered by the jury during its deliberations on punishment.  He argues that the charge instructed that the jury could not consider such evidence as sufficient to answer negatively on either punishment issue.  Miller argues that the jury instructions were  unconstitutional under *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934 (1989).

Miller requested, but was denied, the following instruction on punishment, "[a]ny evidence that is concluded mitigating against the imposition of the death penalty may be sufficient to require a no answer to the issues."  The jury was instructed, in part, as follows:

> You are instructed that if you return an affirmative finding on each of the special issues submitted to you, the Court shall sentence the defendant to death.  You are further instructed that if you return a negative finding on any special issue submitted to you the Court shall sentence the Defendant to the Texas Department of Corrections for life.  You are therefore instructed that your answers to the special

31

issues which determines the punishment to be assessed the Defendant by the Court should be reflective of your finding as to the personal culpability of the Defendant, Garry Dean Miller, in this case.

You are instructed that when you deliberate on the questions posed to you in the special issues you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial whether presented by the State or by the Defendant. A mitigating circumstance may include but is not limited to any aspect of the Defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case you must decide how much weight they deserve, if any, and thereafter give effect and consideration to them in assessing the Defendant's personal culpability at the time you answer the special issue. *If you determine when giving effect to the mitigating evidence, if any, that a life sentence as reflected by a negative finding to the issue under consideration rather than a death sentence is an appropriate response to the personal culpability of the Defendant a negative finding should be given to the special issue under consideration.*

(emphasis added).

The jury at the punishment phase of a capital case must be permitted to give effect to any constitutionally relevant mitigating evidence. *See Green v. Johnson*, 116 F.3d 1115, 1126 (5th Cir. 1997) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 875 (1982)). In *Penry*, the Supreme Court reversed a death sentence on the ground that, although the evidence regarding the defendant's mental retardation and childhood abuse was presented to the jury at the penalty phase of the trial, the

32

special issues prescribed by Texas statute prevented the jury from giving mitigating effect to that evidence. *Penry*, 492 U.S. at 328, 109 S.Ct. at 2952.

On direct appeal, the Texas Court of Criminal Appeals acknowledged that the mitigating evidence, that Miller was suffering from a "'very severe mental disorder'" at the time of the offense which "'interfered with his knowing right from wrong,'" "may or may not have been considered mitigating evidence of the type contemplated by the Supreme Court in *Penry*." The Court concluded that the trial court's instruction on mitigating circumstances provided the jury with an adequate vehicle to express and to give effect to its "reasoned moral response" to Miller's mitigating evidence, if any existed.

In *Penry,* "[t]he jury was never instructed that it could consider the evidence offered by Penry as mitigating evidence and that it could give mitigating effect to that evidence in imposing sentence." 492 U.S. at 320, 109 S.Ct. at 2947. The Supreme Court rejected "the State's contrary argument that the jury was able to consider and give effect to all of Penry's mitigating evidence in answering the special issues without any jury instructions on mitigating evidence." *Id.* at 322, 109 S.Ct. at 2948.

Miller's jury, unlike Penry's, was instructed that it should consider mitigating evidence when deliberating on the special issues and that a mitigating circumstance may include, but is not limited to, any aspect of Miller's character and record or

33

circumstances of the crime which the jury believed could make a death sentence inappropriate. The jury was instructed that if it identified any mitigating circumstances, it should weigh them and give effect and consideration to them in assessing Miller's personal culpability. The jury was instructed that if it determined when giving effect to the mitigating evidence, if any, that a life sentence rather than a death sentence was an appropriate response to Miller's personal culpability, a negative finding should be given to the special issue under consideration.

Miller has not demonstrated that his requested instruction was required under *Penry* or that the challenged instructions were barred by *Penry*. He has not shown that the jury was prevented from considering the evidence of his dissociative condition at the time of the offense. Therefore, we conclude that he has not made a substantial showing of the denial of a constitutional right.

F.   INFORMING JURY REGARDING PAROLE ELIGIBILITY

Miller argues that his due process and Eighth Amendment constitutional rights were violated because the trial court failed to inform the jury during the punishment phase of the trial that he would not be eligible for parole for fifteen years if he received a life sentence. Relying on *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187 (1994), Miller argues that, had the jury been informed that a life sentence would require him to spend fifteen calendar years in prison before becoming eligible for parole, a member of the panel could have been convinced that he would not

34

pose a future danger.

In *Simmons,* the Supreme Court held that if the defendant's future dangerousness is at issue and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is ineligible for parole. 512 U.S. at 156, 114 S.Ct. at 2190. This Court has explained that *Simmons* requires that a jury be informed about a defendant's parole ineligibility only when (1) the state argues that a defendant represents a future danger to society, and (2) the defendant is legally ineligible for parole. *Allridge v. Scott*, 41 F.3d 213, 222 (5th Cir. 1994) (footnote omitted). Miller concedes that *Simmons* is distinguishable because Simmons was not eligible for parole and "would have effectively spent his natural life in the penitentiary." More to the point, because Miller would have been eligible for parole under Texas law if sentenced to life, we find his reliance on *Simmons* "unavailing." *Id.*

In addition to asserting a due process claim, Miller argues that the jury should have been instructed as to parole eligibility in regard to a life sentence under the Eighth Amendment. "We have consistently held, however, that neither the due process clause nor the Eighth Amendment compels instructions on parole in Texas." *Johnson v. Scott,* 68 F.3d 106, 112 (5th Cir. 1995).

Once again, in light of this Court's precedent, Miller has not made a substantial showing of the denial of a constitutional right with respect to this claim. Further, he cannot show that the state

35

court's denial of relief on this claim involved an unreasonable application of clearly established federal law as determined by the Supreme Court.

G. PROSECUTORIAL MISCONDUCT

Miller argues that an erroneous statement of law by the prosecutor during voir dire as to the consequences of a verdict of not guilty by reason of insanity violated his constitutional rights. As discussed above in the context of an ineffective assistance of counsel claim, during voir dire, the prosecutor stated, "you see, if you are insane at the time of the commission of an offense, sane at the time of trial you walk. You are through, a complete and total defense."

As Miller asserts, under Tex. Code Crim. Proc. Ann. art. 46.03 § 1(e), "[t]he court, the attorney for the state, or the attorney for the defendant may not inform a juror or prospective juror of the consequences to the defendant if a verdict of not guilty by reason of insanity is returned." On Miller's direct appeal, the Texas Court of Criminal Appeals opined that "[a]s no timely objection was made, nothing has been preserved for our review."

The court below therefore held that this claim was procedurally barred. If a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice that is attributable to the default. *Coleman v. Thompson,* 111 S.Ct. 2546, 2565 (1991). Miller does not

specifically argue that he has shown cause and prejudice sufficient to lift the procedural bar. Nevertheless, as discussed previously in a separate argument, he does contend that counsel rendered ineffective assistance by failing to object to these remarks. Because we have determined that counsel did not render ineffective assistance, Miller cannot demonstrate cause and prejudice to overcome the procedural bar. Miller has not made a substantial showing of the denial of a constitutional right and is not entitled to a COA on this claim.

In sum, Miller has not shown that any of his claims are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further. *Drinkard,* 97 F.3d 751, 755-56 (5th Cir. 1996). Because Miller has failed to make a substantial showing of the denial of a constitutional right, we DENY his request for a COA.

DENIED.