United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 28, 2003**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-40591

_____

KEVIN LEE ZIMMERMAN,

Petitioner-Appellant,

v.

JANIE COCKRELL, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

Respondent-Appellee.

_____

Appeal from the United States District Court for the
Eastern District of Texas
9:95-CV-002

_____

Before SMITH, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Petitioner Kevin Lee Zimmerman (Zimmerman), convicted of capital murder in Texas and

sentenced to death, appeals the denial of federal habeas relief. The district court granted a certificate

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

of appealability (COA) with respect to three issues: (1) cumulative error based on ineffective assistance of counsel; (2) wrongful exclusion of a juror for cause; and (3) improper prosecutorial argument. Additionally, in a previous opinion, this Court granted a COA with respect to Zimmerman's claim of ineffective assistance based on counsel's failure to investigate whether he was competent to stand trial.

I       FACTUAL AND PROCEDURAL HISTORY.

Zimmerman, George Weber, and Kay Gonzales, arrived at a Motel 6 in Beaumont on October 23, 1987.[1] While at the motel, they met the victim, Leslie Gilbert Hooks, who also was staying at the motel. After having some drinks, Hooks suggested that they go to the fair. After returning from the fair, all four people returned to Zimmerman's room. After a short time, Hooks and Kay Gonzales went to Hooks's motel room, where Hooks paid Gonzales to have sexual intercourse. Hooks and Gonzales returned to Zimmerman's room.

After some time, Gonzales went to the bathroom and heard a struggle ensuing in the nearby bedroom. In that room, Zimmerman and Weber, armed with knives, attacked Hooks. After the two men stabbed him 31 times, Zimmerman took Hooks's wallet and gave it to Weber. Zimmerman, Weber, and Gonzales left in their car to bring Zimmerman to a hospital. While the car broke down after only a short time, Zimmerman did finally reach the hospital, where he received treatment for a knife wound.

Zimmerman was subsequently arrested and placed in jail. While in jail, he wrote numerous letters to Weber and to the district attorney. At trial, the State introduced many pieces of

---

[1] The facts surrounding the offense are taken nearly verbatim from the opinion of the Texas Court of Criminal Appeals. *Zimmerman v. State,* 860 S.W.2d 89, 92-93 (Tex.Crim.App. 1993).

correspondence Zimmerman had written and signed. In one of these letters to the district attorney, he wrote that:

> [Hooks] never stabbed me and we never got into a fight. [Hooks] had 4 or 5 hundred dol[l]ars on him and we were drinking so I decided to kill him and take his f[—]ing money. When we got back to the room [Hooks] did not leave because I took out my knife and opened it and started stabbing him and in the course of me stabbing him I accidentally got stab[b]ed in my arm. After he was dead and I robbed--I rolled him over took the money out of his front pocket and took his wallet. I told George Weber that if he ever said any thing I would kill him, too an[d] we left. The car broke down on the side of the road I made George flag somebody down to take me to the hospital and he did. I through [sic] the knife in the ditch, kicked off my shoes and threw my wallet out. I don't know how much money there was but it was not much because [Hooks] bought some jew[e]lry for Kay at the fair but however much it was I gave it to George and told him to be cool and split, I would handle the rest.

The contents of this letter were corroborated by the testimony of Gonzales. According to her, Zimmerman and Hooks were arguing about an incident that had occurred at the fair. Suddenly, Zimmerman "picked up a knife and ... stabbed him [the decedent] in his shoulder." Gonzales then went into the bathroom and came back out, only to see both Zimmerman and Weber stabbing the decedent, who was yelling "Don't kill me. Please don't let me die. Don't kill me. Please don't let me die." After Hooks stopped moving, Zimmerman "went to get . . .[the] wallet out of his pockets."

A Jefferson County, Texas jury found Zimmerman guilty of capital murder. After the punishment phase of the trial, the jury affirmatively answered the special issues set forth in Article 37.071(b) of the Texas Code of Criminal Procedure, and the trial court sentenced Zimmerman to death. The Texas Court of Criminal Appeals affirmed the conviction and sentence. *Zimmerman v. State,* 860 S.W.2d 89 (Tex.Crim.App. 1993), and the Supreme Court remanded the case in light of *Johnson v. Texas,* 509 U.S. 350, 113 S.Ct. 2658 (1993). *Zimmerman v. Texas,* 510 U.S. 938, 114

3

S.Ct. 374 (1993).  Upon remand, the Court of Criminal Appeals again affirmed the judgment of the trial court.  *Zimmerman v. State*, 881 S.W.2d 360 (Tex.Crim.App. 1994).  The Supreme Court denied Zimmerman's petition for writ of certiorari.  *Zimmerman v. Texas,* 513 U.S. 1021, 115 S.Ct. 586 (1994).

Zimmerman subsequently filed a petition for writ of federal habeas corpus in district court that was dismissed without prejudice for failure to exhaust state remedies.  Zimmerman filed a state habeas petition, and the state court held an evidentiary hearing with respect to the claim of ineffective assistance of counsel.  The state court adopted the proposed findings of fact and conclusions of law submitted by the State and recommended denying relief.  The Court of Criminal Appeals denied relief "[b]ased upon the trial court's findings and [its] own review."

Zimmerman then filed the instant petition, which the district court denied.  As noted above, the district court granted Zimmerman a COA with respect to three issues, and we granted a COA with respect to Zimmerman's claim of ineffective assistance based on counsel's failure to investigate whether he was competent to stand trial.

II.     STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2254(d), we defer to a state court's adjudication of a petitioner's claims on the merits unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict

4

with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1519-20 (2000). A state court's decision constitutes an unreaso nable application of clearly established federal law if it is objectively unreasonable. *Id.* at 1521. Additionally, pursuant to section 2254(e)(1), state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Valdez v. Cockrell,* 274 F.3d 941, 947 (5th Cir. 2001).

### III.     ANALYSIS

#### A.     CUMULATIVE ERROR OF COUNSEL

The district court granted a COA with respect to the cumulative effect of ineffective assistance of counsel. "The cumulative error doctrine provides relief only when the constitutional errors committed in the state court so 'fatally infected the trial' that they violated the trial's 'fundamental fairness.'" *Spence v. Johnson,* 80 F.3d 989, 1000 (5th Cir. 1996) (quoting *Derden v. McNeel,* 978 F.2d 1453, 1457 (5th Cir. 1992) (en banc)). To determine whether cumulative error has been shown, this Court "review[s] the record as a whole to determine whether the errors more likely than not caused a suspect verdict." *Derden,* 978 F.2d at 1458.

Zimmerman has alleged numerous allegations to support his claim of cumulative ineffective assistance of counsel.[2] As indicated, the district court granted a COA with respect to the claim of cumulative ineffective assistance of counsel. Additionally, this Court granted a COA with respect to

---

[2] Zimmerman had several court-appointed attorneys withdraw from representing him prior to trial. Ultimately, Linda Cansler was Zimmerman's lead counsel and, unless otherwise noted, it is her performance that is at issue.

Zimmerman's claim of ineffective assistance based on counsel's failure to investigate whether he was competent to stand trial. Therefore, we will consider the competency argument as an independent claim of ineffective assistance of counsel. We will also consider the competency claim as an instance of alleged ineffectiveness in support of his cumulative claim. As set forth below, several of the alleged instances of ineffective assistance we disposed of as individual claims in our previous opinion ruling on his request for a COA. The remaining instances of alleged ineffective assistance are not addressed as independent claims, but solely as support for the claim of cumulative ineffective assistance. Accordingly, we will address each instance of alleged ineffective assistance of counsel and then consider all of them in light of the entire record to determine the claim of cumulative error.

The Supreme Court has recently reaffirmed the familiar two-prong test for ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*(Terry ) Williams v. Taylor,* 120 S.Ct. 1495, 1511 (2000) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052 (1984)). To demonstrate that counsel was ineffective, a petitioner must establish that counsel's representation fell below an objective standard of reasonableness. *See id.* To show prejudice, he must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *See id.* at 1511-12.

1.      FAILURE TO INVESTIGATE BACKGROUND OF VICTIM

Zimmerman's first argument in support of his claim of cumulative ineffective assistance of

6

counsel is that counsel failed to investigate the background of the victim. In our previous opinion, we denied a COA with respect to this argument pursuant to 28 U.S.C. § 2253(c)(2). We concluded that had the jury been presented with evidence of the victim's propensity for violence, there is not a reasonable probability that the result in either phase of the trial would have been different. Subsequent to our opinion, the Supreme Court explained that when a COA is sought, the court of appeals should limit its examination to the threshold inquiry of whether the petitioner has made a substantial showing of the denial of a constitutional right. *Miller-El v. Cockrell,* __ U.S. __, 123 S.Ct. 1029, 1038 (2003). To the extent that our previous opinion may be construed as stepping over the threshold inquiry, we have again examined this claim and determined that Zimmerman has failed to make a substantial showing of the denial of a constitutional right.

### 2. FAILURE TO INVESTIGATE ZIMMERMAN'S MENTAL HEALTH

Zimmerman's next argument in support of his claim of cumulative ineffective assistance of counsel is that counsel failed to investigate his mental health. In our previous opinion, we denied a COA with respect to this argument. We concluded that had the jury been presented with the mental health evidence, there is not a reasonable probability that the result in either phase of the trial would have been different. To the extent that our previous opinion may be construed as stepping over the threshold inquiry involved in determining whether to grant a COA, we have again examined this claim and determined that Zimmerman has failed to make a substantial showing of the denial of a constitutional right. *Miller-El,* __ U.S. at __, 123 S.Ct. at 1038.

7

### 3. FAILURE TO EVALUATE ZIMMERMAN FOR COMPETENCY

As previously set forth, this Court granted a COA with respect to Zimmerman's claim that counsel rendered ineffective assistance by failing to have him evaluated for competency to stand trial. It is well established that "[d]ue process prohibits the conviction of a person who is mentally incompetent." *Bouchillon v. Collins,* 907 F.2d 589, 592 (5th Cir. 1990) (footnote and citation omitted). The test for determining competency is whether, at the time of trial, the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him." *Id.* (citations and internal quotation marks omitted). To prevail on an ineffective assistance claim based on counsel's failure to obtain a competency evaluation, the petitioner must demonstrate a reasonable probability that he was incompetent to stand trial. *Id.* at 595.

Here, the district court held that counsel's failure to request a competency evaluation constituted deficient performance but denied the claim because it found that Zimmerman had not shown prejudice. We will assume for purposes of this appeal that counsel's performance was deficient.

Zimmerman first argues that the district court erred in holding him to a higher standard with respect to the prejudice prong. Zimmerman is mistaken. The district court found that "Zimmerman has not established that there is a reasonable probability that he was in fact incompetent at the time of his trial." This phrasing is almost identical to our language in *Theriot v. Whitley,* 18 F.3d 311, 313 (5th Cir. 1994) ("even if [the petitioner's] counsel had investigated his competence to stand trial, [the petitioner] must show that there was a reasonable probability that he was in fact incompetent").

8

Zimmerman next faults the district courts for not considering that the trial court had a duty to *sua sponte* hold a competency hearing. Although it is not clear, we understand Zimmerman's argument to be that because the trial court had a duty to hold a competency hearing, counsel's failure to request the hearing constitutes per se prejudice. We do not agree. The claim before us is that counsel rendered ineffective assistance by failing to seek a competency hearing. We have assumed counsel's performance was deficient and are determining whether Zimmerman has shown prejudice as a result. Thus, the relevant inquiry is *not* whether the trial court should have held a competency hearing. The relevant inquiry is whether Zimmerman has established prejudice with respect to this claim, *i.e.,* a reasonable probability that he was incompetent at the time of his trial.

Zimmerman's principal argument is that, based on the evidence offered during his habeas proceedings, the district court erred in not finding a reasonable probability of his incompetence to stand trial. Zimmerman first points to the letters he wrote his initial trial counsel, Haden (Sonny) Cribbs, who withdrew from representing Zimmerman prior to trial.[3] In those letters he asked that counsel seek a "sanity hearing."[4] Zimmerman expressly does not rely on these letters in an attempt to prove his incompetency. Instead, he relies on them to show that trial counsel should have been on notice that there were serious issues with respect to his competency to stand trial. We understand this evidence to be relevant only to the deficiency prong, which we already assume to be proven.

Zimmerman's strongest evidence in support of showing a reasonable probability that he was incompetent at the time of trial is a Minnesota Multiphasic Personality Inventory-2 (MMPI-2) test

---

[3] Zimmerman had filed a grievance against Cribbs with the State Bar of Texas.

[4] The parties refer to Zimmerman's request as a request for a "competency" evaluation. Pursuant to the Director's unopposed motion, the record on appeal was supplemented with three letters from Zimmerman to Cribbs. In those letters, Zimmerman refers to a "sanity hearing."

administered three weeks before his trial in 1990. The "profile validity" section of the MMPI-2 provides that "[t]his client has endorsed a number of psychological problems, suggesting that he is experiencing a high degree of stress. Although the MMPI-2 profile is probably valid, it may reflect some exaggeration of symptoms." Additionally, the "symptomatic patterns" section of the MMPI-2 provide, in part, as follows:

> The client appears to be quite confused and disorganized, and is experiencing severe personality deterioration. His MMPI-2 profile reflects an active, florid psychotic process, which includes a loss of contact with reality, inappropriate affect, and erratic, possibly assaultive behavior. He is preoccupied with bizarre ideas and abstract thoughts, and probably has delusions and hallucinations. He tends to project blame onto others and appears to withdraw into fantasy in an attempt to deal with his distress. In an interview, he is likely to be circumstantial, tangential, and disorganized. *It is unlikely that he could contribute to his own defense in a legal hearing, since his behavior is inappropriate and his thoughts are illogical.*

(emphasis added).[5]

---

[5] The "symptomatic patterns" section also provides as follows:

> He is preoccupied with feeling guilty and unworthy. He feels that he deserves to be punished for wrongs he has committed. He feels regretful and unhappy about life, and seems plagued by anxiety and worry about the future. He feels hopeless at times and feels that he is a condemned person. He endorsed a number of attitudes that reflect feelings of low self-esteem and long-standing beliefs about his inadequacy. He has difficulty managing routine affairs, and the item content he endorsed suggests a poor memory, concentration problems, and an inability to make decisions. He appears to be immobilized and withdrawn and has no energy for life. According to his self-report, there is a strong possibility that he has seriously contemplated suicide. Although he does not admit to having suicidal thoughts at this time, he acknowledged having made a suicidal attempt in the past. Given his current depressed mood, a suicide assessment is indicated. He has endorsed a number of items reflecting a high degree of anger. He appears to have a high potential for explosive behavior at times. He views the world as a

10

The diagnostic considerations section provides that "[t]he most likely diagnosis is Schizophrenia, possibly Paranoid type, or a Paranoid Disorder. His unusual thinking and bizarre ideas need to [be] considered in any diagnostic formulation." As previously set forth, the test for competency is whether the defendant has sufficient ability to consult with his lawyer and whether he has a rational as well as factual understanding of the proceedings against him. The emphasized language in the above quoted portion of the MMPI-2 appears to support Zimmerman's claim. Indeed, Zimmerman contends that this evidence by itself carries his burden of showing a reasonable probability that he was incompetent to stand trial.

Although we believe the MMPI-2 is Zimmerman's best evidence, we cannot agree that it is sufficient to show the required prejudice. We do agree with the district court that although the report's evidentiary "value is greatly enhanced by the fact that it was produced within a month of the trial, [it is] lessened by the fact that it is unclear that the examiner understood the legal concept of incompetency." Although inappropriate behavior and illogical thinking presumably would hamper Zimmerman's ability to assist counsel with his defense, these problems do not necessarily demonstrate a lack of rational understanding of the proceedings or an inability to consult with counsel. Accordingly, we agree with the district court's conclusion that the report fails to provide sufficient

> threatening place, sees himself as having been unjustly blamed for others' problems, and feels that he is getting a raw deal out of life. He endorsed a number of extreme and bizarre thoughts suggesting the presence of delusions and/or hallucinations. He apparently believes that he has special mystical powers or a special "mission" in life which others do not understand or accept. The client reports being quite apathetic and despairing; he may feel sadistic or masochistic at times. The client reports bizarre or unusual sensory experiences and confused thinking which should be evaluated carefully.

11

insight with respect to whether Zimmerman met the legal standard of competency.

Zimmerman next relies on a letter from Dr. Allen Childs dated June 24, 1997. However, as the Director argues, the letter essentially addressed possible explanations for Zimmerman's behavior at the time of the crime in 1987. We agree with the district court's conclusion that the letter was not probative of the ultimate determination of whether Zimmerman was legally competent to stand trial in 1990.

Zimmerman also relies upon Dr. Price's affidavit dated April 13, 1995. However, Zimmerman admits that this affidavit and Dr. Childs' letter are not "directly relevant to the question of [his] competency at the 1990 trial." Nonetheless, Zimmerman asserts that these two documents are relevant to counsel's deficient performance in failing to have her client evaluated. Once again, we are assuming deficient performance and only addressing the prejudice prong on appeal.[6] In any event, we agree with the district court's conclusion that Dr. Price's affidavit is not helpful with respect to determining Zimmerman's competency at the time of trial.

Additionally, Zimmerman relies on the letters he wrote to the trial court and the prosecutor. Zimmerman indicated that he had been planning to raise self defense but because he realized he was a dangerous person, he decided to tell the truth. He admitted to conduct comprising the elements of capital murder and invited the prosecutor to obtain a capital murder indictment.[7] Although the letters

---

[6] Zimmerman also argues that counsel failed to obtain medical records relating to the head injury he received as a child and his school records. For example, he cites a "history of abnormal EEGs." However, it is undisputed that pursuant to his counsel's request of the state trial court, Zimmerman underwent an EEG, and the results were normal. Zimmerman has failed to show that other medical records relating to his head injury or his school records were particularly probative of his competency to stand trial in 1990.

[7] At that time, he had not been indicted for capital murder.

could be interpreted as "indirectly" suicidal, the letters also indicate that Zimmerman had some

understanding of the proceedings against him.[8]

Indeed, Zimmerman wrote a letter to one of his attorneys, Harold Laine,[9] requesting a motion

to suppress the letters he had sent to the authorities:

> I am very worried and concerned of the seriousness I have brought on myself with all the ridiculous and flabbergasting childish letters I wrote when I was in fact highly frustrated with the system of law, (unfair and conspiring law), co urt appointed attorneys telling me there was no way to justify self-defense because the man was stabbed 31 times and if I went to a jury trial I would get a life sentence on murder. I also feel and believe I was not in a sound st ate of mind because of this frustration to realize the danger I was bringing on myself.

Of course, this letter to Laine was written after Zimmerman's letters to the authorities and prior to

trial. It certainly indicates a sufficient ability to consult with his lawyer and at least some rational

understanding of the proceedings against him.

Moreover, the attorney who ultimately represented Zimmerman at trial, Linda Cansler,

submitted an affidavit stating in relevant part that:

> I became attorney for Kevin Zimmerman years after Sonny Cribbs had contact with him. I had extensive conversations with Kevin that were both cordial and candid. I'll assume Habeas Counsel is referring to Article 46.02 o f the Texas Code of Criminal Procedure, when she refers to a competency hearing. That would certainly be the basis for any motion that I would file for a defendant, whether in a capital case or any other. I, myself, felt no need to raise this issue on my motion. Kevin did not pursue it with me. After t rial had started, Kevin did make a statement which caused me to request the Court to have Kevin undergo an EEG. Those results were normal. I also had Kevin

---

[8] We note that Zimmerman's letters detailing the offense are some indication that he could assist counsel with respect to his defense.

[9] Prior to trial, Laine withdrew from representing Zimmerman because a state's witness was a former client.

13

examined by Dr. Coxe and Dr. Dickerson.

\*      \*      \*

I did not notice the attention deficits mentioned by . . . Habeas Counsel. During the long periods of time I spent with Kevin, he was most attentive to the matters at hand. He was also attentive at court, to the extent of passing notes to his attorneys.

As Zimmerman's lead trial counsel, Cansler apparently perceived that he had the ability to consult with her and a reasonable degree of rational understanding of the proceedings against him.

In light of the entire record, including Zimmerman's letters and counsel's affidavit, we agree with the district court's conclusion that Zimmerman has not shown a reasonable probability that he was incompetent at the time of his trial. More to the point, we note that "[o]ur role under this [AEDPA] inquiry is not to determine whether the state court's construction of federal law was merely wrong, but whether it was wrong to the point of being unreasonable." *DiLosa v. Puckett,* 279 F.3d 259, 262 (5th Cir. 2002). Accordingly, even if we were persuaded the state court's conclusion that Zimmerman has not demonstrated ineffective assistance of counsel was "merely" erroneous, Zimmerman is not entitled to relief under AEDPA. Even assuming the state court's conclusion was erroneous, applying the previously set forth deferential AEDPA standard, we would be constrained to hold that the state court's conclusion was not contrary to, or an unreasonable application of, established federal law.

4.      FAILURE TO INVESTIGATE FAMILY OF VICTIM WITH RESPECT TO SENTENCING WISHES

Zimmerman next argues that counsel's failure to interview the victim's family members to

determine their wishes with respect to his punishment supports his claim of cumulative ineffective assistance of counsel. Zimmerman's habeas counsel submitted an affidavit indicating that the victim's sister, Juanita Chance, told him that "she saw no reason to execute Zimmerman since it would not bring back Gilbert." However, counsel's affidavit also provides that "[s]he cautioned us that other members of her family do not feel that way, and if they do, they won't speak up." The state habeas court found that "there is no testimony, no [admissible] evidence of the victim's family's wishes within the record." Indeed, this Court has made clear that "we are [loath] to accept the self-serving statements of habeas counsel as evidence that other persons were willing and able to testify on [a defendant's] behalf." *Lincecum v. Collins,* 958 F.2d 1271, 1280 (5th Cir. 1992). Accordingly, Zimmerman has failed to rebut the state court's fact finding that there is no admissible evidence of the victim's family's wishes in the record. He has entirely failed to demonstrate that, had counsel interviewed the victim's sister, she would have testified at trial. Even assuming the sister would have testified, we are not convinced that, had the sister testified that "she saw no reason to execute Zimmerman since it would not bring back Gilbert," there is a reasonable probability of a different outcome at the punishment phase.

### 5. FAILURE TO MOVE FOR RECUSAL

Zimmerman argues that counsel's failure to move for recusal of the trial judge and prosecutor after he sent them threatening letters supports his claim of cumulative ineffective assistance of counsel. The district court found that counsel's performance was not deficient, recognizing that "[t]hreats or attempts to intimidate a judge will normally not satisfy the requirements for recusal." (citing *United States v. Greenspan,* 26 F.3d 1001, 1005 (10th Cir. 1994)). Although Zimmerman

15

recognizes the sound policy reasons for this rule, he argues that it should not apply here because "the intimidation factor was notably absent here, as Zimmerman had no intent or ability to carry through with any alleged threats."[10] Instead, he argues that the letters were a result of his severe depression and designed to obtain a death sentence. Under those circumstances, Zimmerman argues, the judge and the prosecutor would have been "invaluable witnesses as to the effect of the letters on their opinion of [his] mental state, and whether they perceived them as the product of a competent mind." Because of counsel's failure to seek recusal of the judge and prosecutor, Zimmerman argues that he was unable to cross examine them. Although the briefing does not make it clear, it appears Zimmerman is referring to the inability to cross examine the judge and prosecutor in a competency hearing. We are not persuaded by this argument because we do not believe it would have been necessary to call the judge or prosecutor regarding the contents of the letters in a competency hearing in that the letters speak for themselves.

In any event, the state habeas court found that "there was no evidence of disqualification of either the judge or the prosecutor." Zimmerman has not rebutted these factual findings with clear and convincing evidence. Zimmerman has failed to show deficient performance or that a motion to recuse would have been granted.

6.    FAILURE TO OBJECT TO ADMISSION OF EVIDENCE

Zimmerman makes a general argument in support of his cumulative ineffective assistance

_____

[10] Of course, this concession undermines any claim that the judge or prosecutor actually felt threatened. More importantly, simply because the defendant is in jail cannot mean that he does not have the means to carry out any threats because such an interpretation would swallow the rule that recusal is not granted based solely on the fact that a party has threatened a judge.

16

claim that counsel failed to make any motions to suppress evidence and failed to object to "inadmissible penalty phase evidence at the guilt stage." However, Zimmerman cites only one instance of counsel's specific failure to object. He asserts that counsel should have objected to the lack of a proper foundation for the introduction of the victim's wallet .

In *Lockhart v. McCotter,* 782 F.2d 1275, 1280 (5th Cir. 1986), the petitioner argued that his counsel rendered ineffective assistance by failing to lodge a chain of custody objection to the state's introduction of the robbery victim's wallet. This Court explained that "when an object cannot be easily altered or substituted, establishing a continuous chain of custody is not as important." *Id.* at 1281 (citing *McCormick's Handbook of the Law of Evidence,* 427 (E. Cleary 2d ed. 1972)). In that case, the wallet contained pictures of the victim's girlfriend and her children, was easily identifiable and "not subject to undetectable alteration." *Id.* Additionally, a police officer identified the wallet as the same one he had removed from the petitioner's personal property envelope. *Id.* We concluded that an objection under those circumstances would not have successfully excluded the wallet. *Id.* Thus, we held that the failure to object could not have prejudiced the petitioner. Id.

Likewise, in the instant case, the victim's wallet was readily identifiable because it contained pictures of three of the victim's children, his mother, and his wife. Zimmerman acknowledges the holding in *Lockhart,* but fails to distinguish it from his case. *Lockhart* precludes a showing of ineffective assistance based on failure to object to the chain of custody of the victim's wallet in this case.

### 7. FAILURE TO OBTAIN MEDICAL & MENTAL HEALTH RECORDS

In further support of his claim of cumulative ineffective assistance of counsel, Zimmerman

17

argues that counsel failed to obtain his medical and mental health records. In his previous motion for COA, Zimmerman raised this argument in the context of his claim that counsel was ineffective for failing to investigate his mental health. In our previous opinion, we denied a COA with respect to this argument. We concluded that had the jury been presented with such evidence, there is not a reasonable probability that the result in either phase of the trial would have been different. To the extent that our previous opinion may be construed as stepping over the threshold inquiry involved in determining whether to grant a COA, we have again examined this claim and determined that Zimmerman has failed to make a substantial showing of the denial of a constitutional right. *Miller-El,* __ U.S. at __, 123 S.Ct. at 1038.

### 8. FAILURE TO REPRESENT ZIMMERMAN PRIOR TO TRIAL

In further support of his cumulative ineffective assistance of counsel claim, Zimmerman argues that counsel failed to actually represent Zimmerman prior to trial. In his motion for COA, Zimmerman raised this argument in the context of his conflict of interest claim. To demonstrate that the conflict of interest had an adverse effect with respect to counsel's performance, Zimmerman relied upon his own conduct (the letters he wrote admitting his guilt to the capital murder charges). In our previous opinion, we rejected this argument, concluding that Zimmerman's actions were not the proper focus.[9] Likewise, we believe that counsel's actions (not Zimmerman's) are the proper focus in determining whether counsel's deficient performance prejudiced him.

---

[9] To the extent that our previous opinion may be construed as stepping over the threshold inquiry involved in determining whether to grant a COA, we have again examined this claim and determined that Zimmerman has failed to make a substantial showing of the denial of a constitutional right. *Miller-El,* __ U.S. at __, 123 S.Ct. at 1038.

18

The briefing is unclear but it appears that Zimmerman is *not* raising an absence-of-counsel type claim under *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039 (1984). Instead, he is alleging two instances of ineffective assistance prior to trial: (1) counsel's failure to have him evaluated for competency; and (2) counsel's failure to hire an investigator to interview the cab driver. In this opinion, we have already addressed the failure of counsel to have Zimmerman evaluated for competency. With respect to his claim regarding counsel's failure to interview the cab driver, we noted in the context of another claim in our previous opinion that although the victim did not pay the driver, the driver did not state that Hooks had no money but rather that Zimmerman actually paid. Also, Gonzales' testimony and Zimmerman's letter indicate that the victim had cash prior to the murder. Moreover, regardless of the amount of cash the victim had, it is undisputed that the victim's wallet was taken. Zimmerman has not shown that, but for counsel's inactions, there is a reasonable probability of a different outcome at trial.

## 9.    FAILURE TO INVESTIGATE *PENRY* EVIDENCE

Zimmerman also contends that counsel's failure to investigate and present mitigating evidence at the punishment phase supports his claim of cumulative ineffective assistance. More specifically, Zimmerman argues that counsel's failure to present his "medical and mental health evidence, head injury, [and] organic brain damage [constitutes] a failure under *Penry v. Lynaugh*, 492 U.S. 302 (1989)." For the most part, this argument is encompassed in Zimmerman's above previous complaints with respect to counsel's alleged failure to investigate his mental health and present such evidence at the punishment phase.

In any event, Zimmerman cites *Lockett v. Anderson*, 230 F.3d 695 (5th Cir. 2000), for the

19

proposition that counsel is ineffective for failing to prepare and present adequate mitigation evidence. *Lockett* is distinguishable from the instant case. In *Lockett,* although defense counsel was aware of the defendant's seizure problem and incidents of head trauma, counsel failed to conduct even a minimal investigation of this mitigating evidence. As a result, during the punishment phase, counsel simply pleaded for mercy and did not introduce any mitigating evidence with respect to the defendant's mental condition. *Lockett,* 230 F.3d at 714-16.

In contrast, during the punishment phase at Zimmerman's trial, defense counsel called a psychologist who testified that Zimmerman had a low I.Q. and a paranoid personality disorder. With respect to future dangerousness, the psychologist further testified that, after an adjustment period, Zimmerman would likely do well in a prison setting. Defense counsel presented testimony with respect to a head injury Zimmerman received as a child and a metallic plate inserted in his skull as a result of the injury. Counsel also presented evidence that Zimmerman and his family had always believed that he had to be careful of the injury because if "he was hit on his head that he could die."

As set forth in our previous opinion, although the jury learned of the metallic plate in Zimmerman's skull, the jury did not learn of his violent tendencies that appeared after the injury. Again, as set forth in our previous opinion, this evidence "mitigated his culpability and at the same time it indicated that he would be dangerous in the future." *Lackey v. Scott,* 28 F.3d 486, 488 (5th Cir. 1994). Under these circumstances, we conclude that, had counsel introduced further evidence with respect to Zimmerman's head injury, there is not a reasonable probability of a different outcome.

### 10. FAILURE TO SEEK HEARING

Zimmerman urges this Court to find cumulative ineffective assistance of counsel based, in part, on the failure to seek a hearing on the voluntariness of the oral and written statements he made

20

to authorities. Prior to trial, counsel moved the trial court for a hearing as to the voluntariness of the oral and written statements made by Zimmerman to the authorities. The trial court granted that motion and ruled that no evidence was to be allowed without a hearing.

Counsel objected to the admission of the letters, arguing that they constituted hearsay, that there was a lack of a proper predicate, and that an insufficient chain of custody had been shown. Counsel did not object based on the lack of a hearing.

The state habeas court found that Zimmerman had "fail[ed] to allege specific facts. He fail[ed] to state which specific pieces of evidence should have been ruled on pursuant to a hearing." The state habeas court further found that the letters were not a "result of custodial interrogation and therefore not subject to a hearing on the voluntariness."

Zimmerman argues that because of counsel's failure to request a hearing with respect to the admissibility of the letters, he did not have an opportunity to show that they were not the result of knowing and voluntary waivers. However, Zimmerman makes no argument whatsoever in his brief demonstrating how any statement was involuntary. This Court has explained that:

> [c]oercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession. *See Colorado v. Connelly,* 479 U.S. 157, 163-67, 107 S.Ct. 515, 519-22, 93 L.Ed.2d 473 (1986). Although mental condition may be a significant factor in the voluntariness calculus, "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Id.* at 164, 107 S.Ct. at 520.

*Carter v. Johnson,* 131 F.3d 452, 462 (5th Cir.1997). We are aware of no allegations of coercive police conduct. Zimmerman has failed entirely to demonstrate a reasonable probability that, had

21

counsel sought a hearing on the voluntariness of his statements, the statements would have been suppressed.

### 11.    CONFLICT OF INTEREST (Doug Barlow)

Zimmerman's next argument in support of his claim of cumulative ineffective assistance of counsel is that Doug Barlow had an actual conflict of interest while representing him.  As set forth above, in our previous opinion, we denied a COA with respect to this precise argument.  Among other things, we found that Zimmerman had not shown that any conflict had an adverse effect on counsel's performance.  To the extent that our previous opinion may be construed as stepping over the threshold inquiry involved in determining whether to grant a COA, we have again examined this claim and determined that Zimmerman has failed to make a substantial showing of the denial of a constitutional right. *Miller-El,* __ U.S. at __, 123 S.Ct. at 1038.[10]

### 12.    CUMULATIVE ERROR CONCLUSION

Finally, we address whether the above claims constitute cumulative error.  With respect to the cumulative error claim, the state habeas court found that Zimmerman "was convicted due to the substantial amount of evidence against him."  Among other things, the court found that Zimmerman was convicted and sentenced by a jury based on the evidence not because he had a bad lawyer."  Finally, the court "concluded that [Zimmerman] has entirely failed to meet the burden placed upon him under *Strickland v. Washington,* at 466 U.S. 693, which requires him to plead and prove specific

---

[10]   Although Zimmerman has not requested rehearing of our previous opinion, we have re-examined the remaining claims we denied in Zimmerman's COA application in light of the Supreme Court's decision in *Miller-El*, and we remain convinced that reasonable jurists would not find the district court's assessment of those claims debatable or wrong.

acts or failures of trial counsel that show her performance was deficient and plead and prove that such alleged deficient performance was so serious as to deprive [him] of a fair trial whose result is reliable."

As stated previously, the cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness. *Spence,* 80 F.3d at 1000. We find it curious that the district court granted a COA with respect to cumulative error based on ineffective assistance of counsel but denied a COA with respect to each of the individual claims of ineffective assistance. The Director does not argue and this Court apparently has not specifically addressed the issue whether cumulative error applies in the context of ineffective assistance of counsel after AEDPA. *See Miller v. Johnson,* 200 F.3d 274, 285-86 n.6 (5th Cir. 2000) (holding that petitioner had not shown cumulative error with respect to his ineffective assistance of counsel claim but not specifically addressing whether cumulative error applied after AEDPA). We have reservations with respect to the applicability of cumulative error in the context of ineffective assistance after the enactment of AEDPA. This is because in order for there to be constitutional error in the form of ineffective assistance of counsel, the petitioner must fulfill both prongs of *Strickland.* If either prong is not satisfied, then the petitioner has not shown constitutional error, much less unreasonable constitutional error.[11] On the other hand, if a petitioner demonstrates both prongs of *Strickland* and an objectively unreasonable determination in state court, relief is available. There is no need to cumulate. Nonetheless, in an abundance of caution, we have

---

[11] *Cf. Bell v. Cone,* __ U.S. __, 122 S.Ct. 1843 (2002) (although not in the context of a cumulative error claim, Supreme Court recently reversed a court of appeals' holding that a state court's denial of an ineffective assistance claim involved an unreasonable application of clearly established federal law).

examined Zimmerman's claim of ineffective assistance under the rubric of cumulative error and reject Zimmerman's claim. Accordingly, the above-claimed individual errors do not merit relief, nor do we conclude that the cumulative effect of the alleged errors fatally infected the fundamental fairness of the trial.

B.     WRONGFUL EXCLUSION OF PROSPECTIVE JUROR

Zimmerman contends that the trial court's exclusion of a prospective juror, Imogene Whitaker, violated his right to an impartial jury. Zimmerman argues that the trial court excused the prospective juror based upon an incorrect understanding of the proper legal standard.

The standard for determining when a prospective juror may be excluded for cause is whether the prospective "juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852 (1985) (internal quotation marks and footnote omitted). In other words, "if prospective jurors are barred from jury service because of their views about capital punishment on any broader basis than inability to follow the law or abide by their oaths, the death sentence cannot be carried out." *Adams v. Texas,* 448 U.S. 38, 48, 100 S.Ct. 2521, 2527 (1980) (internal quotation marks and citation omitted). A state court's determination of bias is a finding of fact and therefore accorded a presumption of correctness under 28 U.S.C. § 2254(e)(1). *Fuller v. Johnson,* 114 F.3d 491, 500-501 (5th Cir. 1997).

Zimmerman complains of the following statement made by the trial court to counsel during the questioning of Whitaker: "Before I rule I would like to give you the opportunity to address the

24

issue raised by Mr. McWilliams [the prosecutor], that her belief would effect [sic[10]] her deliberations on the fact issues. You've not asked her that. That's the issue . . . ." During his questioning, the prosecutor had stated to Whitaker that "[i]f a juror is opposed to the death penalty they are not disqualified from being a juror. If, however, their beliefs in opposition to the death penalty are such that it will *effect* [sic] *or substantially impair* their ability to serve as a juror, to determine guilt or to answer these questions, not that it would be an automatic, but just effect [sic] them or substantially impair them in performing those duties, then they are not qualified to be on a jury, because the law recognizes that that is unf[air] to do to people." (emphasis added). Of course, as set forth above, the proper standard is whether the prospective juror's beliefs would "prevent or substantially impair" the performance of a juror's duties.

On Zimmerman's direct appeal, the Texas Court of Criminal Appeals expressly applied the proper standard, recognizing that "[p]rospective jurors should be excused for cause only if their views would prevent or substantially impair the performance of their duties as jurors." *Zimmerman v. State,* 860 S.W.2d 89, 95 (Tex.Cr.App. 1993) (citing *Wainwright v. Witt,* 469 U.S. at 424, 105 S.Ct. 852). After setting forth the proper standard, the Texas Court of Criminal Appeals noted that "Whitaker expressly indicated that she would not be able to answer the punishment issues fairly." *Zimmerman,* 860 S.W.2d at 95. The court then concluded that the trial court acted within its discretion in excluding Whitaker. Importantly, it is the state appellate court's determination that we must accord a presumption of correctness. *Williams v. Lynaugh,* 809 F.2d 1063, 1066-66 (5th Cir. 1987).[11]

---

[10] It appears the court reporter incorrectly transcribed "affect" as "effect" throughout the transcript.

[11] In *Williams,* a pre-AEDPA death penalty case, the petitioner argued that the state trial court failed to apply the correct standard in excluding a prospective juror. 809 F.2d at 1065-66.

Thus, Zimmerman's focus on the trial court's enunciation of the standard is misplaced. Moreover, we disagree with Zimmerman's assertion that Whitaker did not waver until after the complained of exchange between the trial court and counsel. Prior to this exchange, Whitaker had stated that she "could really make a true judgment according to the evidence and just blot out my beliefs, as long as [she was] *not making the decision for the death penalty. . . .*" (emphasis added). Also prior to the exchange in question, the prosecutor inquired of Whitaker as follows: "I think your feelings about the death penalty are such that they would effect [sic] your ability to answer those questions. This would substantially impair your ability to answer those questions. Do you [agree] with that?" Whitaker responded "No, not if the evidence is present and *I didn't have to take part in the punishment phase* of it." (emphasis added).

The record reveals that Whitaker equivocated during voir dire. As is not uncommon during questioning of a prospective juror, Whitaker's responses varied depending upon the phrasing of the questions propounded by the prosecutor or defense counsel. In view of the presumption of correctness afforded the state court's factual finding that Whitaker's views would prevent or substantially impair the performance of her duties as a juror, we are unpersuaded that Zimmerman has rebutted the presumption with clear and convincing evidence. As such, Zimmerman is not entitled to relief on this issue.

C.    PROSECUTORIAL ARGUMENT

---

This Court explained that the Texas appellate court properly applied the correct standard and thus we must accord its determination a presumption of correctness. *Id.* at 1066.

Zimmerman contends that the prosecutor's summations at the guilt and punishment phases misrepresented material evidence. For constitutional error to have occurred, a prosecutor's improper argument must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471 (1986); *cf. Earvin v. Lynaugh,* 860 F.2d 623 (5th Cir. 1988) (the evidence must be so insubstantial that no conviction would have occurred but for the argument made by the prosecutor).

The district court held that this claim was procedurally barred under the contemporaneous objection rule. Zimmerman argues that because the Texas Court of Criminal Appeals does not consistently apply the contemporaneous objection rule, the procedural default is excused. However, this Court has held that "[t]he Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims." *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir.1999) (internal citations and quotation marks omitted). Precedent thus precludes excusal of the procedural default on the asserted basis.

Zimmerman further argues that trial counsel's failure to object constitutes "cause" for the procedural default. If a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice that is attributable to the default. *See Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 2565 (1991). Ineffective assistance of counsel may constitute "cause." *Ellis v. Lynaugh*, 883 F.2d 363, 367 (5th Cir.1989).

The district court held that Zimmerman could not establish cause and prejudice because he failed to raise counsel's failure to object to the prosecutor's arguments as a separate ineffective assistance of counsel claim. Zimmerman does not now dispute this holding. We therefore find this

27

claim procedurally barred. Nonetheless, assuming arguendo that the claim was not procedurally barred, as set forth below, because Zimmerman has failed to show that the Court of Criminal Appeals' determination with respect to this claim is contrary to, or involved an unreasonable application of, clearly established federal law, he is not entitled to relief under AEDPA.

### 1. Guilt Phase

Zimmerman first complains of the following remarks made by the prosecutor during closing argument at the guilt phase of trial:

> And those two crime buddies, those two crime partners come to Beaumont in a rattletrap car with virtually no money on the way to Houston. And they get stuck here. And they are sitting in a Motel 6 trying to decide what to do next when, low and behold, Gilbert Hooks shows up and takes everybody to the fair and spends money on Kay Gonzales. And everybody knows that . . . Gilbert Hooks has got some money to spend and they don't.

Zimmerman claims there was no evidence to show that he was aware that Hooks had any money. Zimmerman is mistaken. Zimmerman's letter introduced at trial provided that he knew that Hooks had four or five hundred dollars and had decided to kill Hooks and take the money.

Zimmerman also argues that the evidence did not support the prosecutor's remarks indicating that Donald Ray Feast had testified that Zimmerman admitted to robbing or planning to rob Hooks. Contrary to Zimmerman's assertion, Feast's testimony was consistent with these remarks.[12]

Zimmerman next challenges the prosecutor's argument that, according to Kay Gonzales, Zimmerman killed Hooks because Hooks refused to give him the money. Zimmerman correctly asserts that although Gonzales testified that Zimmerman and Hooks argued, she never testified that

---

[12] For example, Feast testified that "[f]rom what [Zimmerman] told me, I gathered they was trying to rob him."

28

Zimmerman demanded Hooks' wallet. Nonetheless, Gonzales did testify that Zimmerman took Hooks' wallet after he and Weber stabbed Hooks to death. Moreover, the prosecutor's argument is not inconsistent with Zimmerman's admission that he killed Hooks for the money. Thus, we find that these inaccurate remarks did not prejudice Zimmerman.

Zimmerman complains that the following argument made by the prosecutor incorrectly implied that the wallet, which had no blood on it, was found with Zimmerman's bloody clothing: "This wallet belonged to Gilbert Hooks. That was found in Lumberton *right near* where Kevin Zimmerman tossed everything else that may incriminate him or identify him and connect him with that bloody room, Room 132." (emphasis added). The district court found that the statement "right near" was an exaggeration because the wallet was found perhaps a quarter mile from Zimmerman's clothing. However, in light of the other evidence that Zimmerman took Hooks' wallet, Zimmerman has not shown that these remarks prejudiced his conviction.

The prosecutor's argument that codefendant Weber agreed to testify because Zimmerman threatened Weber's life was "made up out of whole cloth," contends Zimmerman. During closing arguments at the guilt phase, the prosecutor stated "And how do you know what kind of person Kevin Zimmerman is? Because he tells you. George [Weber], if you don't do what I want you to I'm going to kill you." Zimmerman fails to acknowledge that in the letter to the district attorney he admitted that "I told George Weber if he ever said anything I would kill him too. . . ." We find this argument to be a fair comment on the evidence.

Accordingly, Zimmerman has failed to show either improper argument or prejudice from improper argument during the guilt phase.

29

2.     Punishment Phase

Zimmerman complains that the prosecutor falsely represented evidence during the punishment phase of the trial with respect to the robbery element of the offense. The prosecutor argued as follows:

> What provocation did Leslie Gilbert Hooks Jr. portray to that defendant that would justify [Hooks] being stabbed 31 times? ["]No you can't have my money.["] So, he gets stabbed in the shoulder a couple a times. Was that the provocation that it was a reasonable provocation to kill that man?

We find no error with respect to the robbery element of the offense because, prior to this punishment phase argument, Zimmerman had been found guilty of capital murder during the guilt stage of the trial. Further, the above remarks (perhaps more correctly described as the prosecutor's rhetorical question) were relevant to the special issues at punishment. More specifically, it appears the prosecutor intended to demonstrate to the jury that Hooks did not provoke the murder. Such argument is clearly relevant to the third special issue submitted to the jury at punishment.[13]

Once again, Zimmerman argues the prosecutor's remarks during the punishment phase argument constituted a "manufactured robbery scenario." The prosecutor argued that "You know from the facts of this case Kevin Zimmerman wanted his money and [ Hooks] wouldn't give it to [Zimmerman]. So he died." Although inaccurate, in light of the evidence showing that Zimmerman killed Hooks for the money, we are not persuaded that the sentence would have been different had the prosecutor's remarks more accurately set forth the evidence.

---

[13] "Do you believe beyond a reasonable doubt that the conduct of the defendant in killing Leslie Gilbert Hooks, Jr. was unreasonable in response to the provocation, if any, by Leslie Gilbert Hooks, Jr.?"

Finally, Zimmerman complains of the prosecutor's statement that "You know from the officer from Breaux Bridge [that Zimmerman] wanted Adley Corville's car or car keys and [Corville] got stabbed for it when he didn't give [Zimmerman] the car keys." Zimmerman characterizes this statement as an "unproven, uncharged allegation." Contrary to Zimmerman's characterization, the following testimony elicited from the Breaux Bridge police officer was consistent with the prosecutor's remarks: "[Zimmerman] was at a bar and he tried to steal another car. Well, he had pulled a knife on Mr. Corville from CeCilia and ordered [Corville] to give him the keys. When [Corville] didn't, he stabbed [Corville]."

To summarize, as set forth above, we find several of the challenged remarks to be a fair comment on the evidence. With respect to the inaccurate comments, Zimmerman's principal complaint is that the prosecutor manufactured a robbery scenario. Ultimately, the inaccuracy of the prosecutor's remarks boils down to alleging that Zimmerman demanded Hooks' money prior to murdering him–as opposed to arguing that Zimmerman murdered Hooks to take his wallet. Such inaccuracy falls woefully short of a showing that his conviction or death sentence constituted a denial of due process.

The district court's judgment denying habeas corpus relief is AFFIRMED.[14]

---

[14] Zimmerman's motion for oral argument is denied.